Jones, Chief Judge,
delivered the opinion of the court':'
This is a suit to recover excess profits taxes paid' for the years 1950,1952, and 1953.
The plaintiff alleges that it increased the capacity of its business more than 50 percent during the base years December 31,1946, to December 31,1949, and that under the applicable statutes[1] and regulations issued pursuant thereto it is entitled to a refund of the taxes in question.
*440 The parties have agreed on the amount of refund in the event it is found that plaintiff is entitled to recover. They have also agreed that plaintiff is entitled to recover if it increased its overall capacity to produce various types of paperboard containers and closures between December 31, 1946, and December 31, 1949, by 50 percent or more within the meaning of section 444 of the Internal Revenue Code of 1939, as amended.
The sole question, therefore, is a factual one — whether plaintiff during the base years in question increased the productive capacity of its business more than 50 percent. To qualify for relief under section 444 a number of showings are required. However, the parties have agreed that plaintiff has qualified in every respect except the one which is in question.
During the years involved in this proceeding plaintiff was engaged in the manufacture of various types of paperboard containers, milk bottle caps and hoods used by dairies and others for the sanitary bottling and packaging of milk, ice cream, and other liquids and moist foods. Plaintiff also leased filling, capping, and container-forming machines to dairies and other customers for use in connection with its products.
The plaintiff manufactured simple paperboard caps for milk bottles which are about one inch in diameter and pasteboard thin. It also manufactured containers in varying amounts in the form of pint, quart, gallon, and larger containers for milk, ice cream, and other dairy and liquid products.
About 1940, plaintiff developed and patented a rectangular container that could be shipped flat, thus occupying much less space until such time as it was put into use. About four years were required for plaintiff’s engineering department to design and produce the equipment to utilize fully the particular product. It was to be shipped in a knocked-down condition to the using dairy where it was assembled, filled, and sealed in one operation on machines developed by plaintiff and leased to the dairy plant. The product was made of the same material and used for the same purposes as the previous product of a similar size, but plaintiff was desirous *441 of being in a better competitive position with other companies who were packaging for large dairies.
While the overall purposes of the containers and cartons remained substantially the same, their form and method of assemblying and shipment were changed — the overall purposes and character of the business remaining unchanged. However, much new equipment was required,. including a large coating machine for applying the plastic resin to -the paper; a lacquer mixing plant for mixing the lacquers; high-speed printing press for printing, scoring, and blanking out the sidewalls; a similar press for printing and blanking out the tops; a similar press for blanking the bottoms; and paper slicing machines. A new building was. constructed to house the new equipment, a solvent recovery plant was constructed, and the plant and equipment were improved in many ways.
Measured in terms of the pounds of paperboard required to produce plaintiff’s products at capacity levels of operation, plaintiff had increased its capacity for production by 68.87 percent during the base years in question. In terms of square feet of paperboard required to produce the capacity levels of operation, plaintiff had increased its capacity for production by 73.27 percent. In terms of the cost of paperboard required to produce at capacity levels of operation, plaintiff had increased its capacity for production by 75.47 percent during the base years in question. Defendant admits these percentage increases in capacity.
If any of these methods of measurement are used plaintiff has fully complied with the terms of the statute.
However, the defendant contends that the method of measurement should be to count each individual unit or separate article on the same basis: the paper cap to be sold to dairies for the purpose of capping milk bottles, and which could be cut in multiple quantities, should count the same as the actual paperboard containers, whether in pints, quarts, gallons, or larger sizes, which were wholly manufactured by plaintiff. Measured in this manner the productive capacity, notwithstanding the great increase in raw materials measured in pounds, linear feet, or raw material costs,, would be only 9.86 percent for the base years in question.
*442 Section 444 of the Internal Keveiine Code of 1939, as amended, is one of the relief provisions of the Korean War excess profits tax law. It follows the pattern of the World War II excess profits tax act imposing a tax on that portion of taxpayer’s earnings during the years of the Korean War which were in excess of a stated'percentage of the corporation’s average earnings during the years 1946 to 1949, or base period. Congress, however, recognized that the actual earnings in the base period of a corporation making substantial changes in its business during the base period was not a proper basis for determining the portion of its war-period earnings which should'be subject to the excess profits tax. Several relief provisions were included in the Korean War act, one of which was the increased capacity for production test for determining excess profits taxes.
The statute clearly makes the capacity for production the basic test. Section 40.444-2 (a) of the regulations issued pursuant to the statute contains the following sentence:
As used in section 444, the term “capacity for production or operation” means the capacity to produce or to operate rather than the level of production or operation actually achieved.'
. Paragraph (b) of the same regulation provides in effect that an increase in capacity for production or operation is deemed to have occurred if the taxpayer establishes that it made an addition or additions to its facilities or replaced all or a part of its existing facilities, and that ns a result of such addition or replacement its capacity for production or operation at the end of the base period was increased by 50 percent.
This subsection of the regulations also provides that,
In determining capacity for production or operation, the unit of measurement customary for the output of the particular hind of business shall he used, such as tons, gallons, barrels, yards, or dozens. [Emphasis supplied.]
In the present case, it has been found as a matter of fact that it is customary in .the plaintiff’s industry to measure overall capacity for production in terms of quantity of paperboard consumed in the production operations. (See finding 30.) *443 As we have indicated, by using such customary standard, -plaintiff has met the overall production test regardless of whether the paperboard consumed is measured in terms of pounds, square feet or cost. .
The only case cited by either party in the briefs is National Grinding Wheel Co. v. Commissioner, 8 T. C. 1278 (1947). This case seems to be inapplicable to the facts of the instant cáse. In that case there was a change in the nature of the business which was involved.
In the instant case, plaintiff was at all times a manufacturer of a variety of paperboard containers and closures used for the sanitary bottling and packaging of milk, ice cream, and other kinds of liquids and moist foods. The various types of production performed and the amount of materials and labor required to meet the terms of capacity are set out in findings 21 to 28, inclusive. The costs and changes, additions, improvements, and replacements are set out in findings 29 and 80..
It seems to us that measured on the basis customary to plaintiff’s industry,- or on any reasonable ■ basis, the plaintiff has fully met the relief requirements of the statute.
In order to avoid these plain facts the defendant must be permitted to count a little round disc that is used as a plugged cap for milk bottles, and which can be cut by a stamping process in multiple quantities, the same as a Bulkan, which- is a full paperboard container capable of holding quantities of ice cream, milk, or other liquids. A thousand of these little round discs require only 2.71 pounds of paperboard, while to make the complete Bulkan in the same numbers would require 479.54 pounds. To count one of these small disc articles on the same basis as the several larger articles, regardless of the amount of materials, cost, labor,,or machinery involved, would be altogether unreasonable, nor would such a standard be consistent with that customarily employed in plaintiff’s industry. The futility of such a-test becomes apparent when it is realized that had the use of milk bottles rapidly increased, rather than slowly being displaced by paper containers, there might have been, under the item method of calculation, a more than 50 percent capacity increase with only some disc cutter machines added. Such a result, of course, could not have been accepted. .
*444 The plaintiff produces a variety of end products all of which are manufactured almost 100 percent from paperboard. It does a large business.
When the entire record is considered and any reasonable basis of measurement is invoked the plaintiff has fully met the terms of the relief statute applicable to the base years in question.
The plaintiff is entitled to recover the sum of $526,047.45, and judgment will be entered in that amount, together with interest thereon as provided by law.
It is so ordered.
WASHINGTON, Circuit Judge, sitting by designation; Lara-more, Judge; Madden, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner George H. Foster, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation with its principal office in Fulton, New York. Plaintiff is, and was during the years involved in this proceeding, engaged in the manufacture of various types of paperboard containers, milk bottle caps and hoods used by dairies and others for the sanitary bottling and packaging of milk, ice cream, and many kinds of liquids and moist foods. The plaintiff distributes its products nationally under the trade name Sealright. Plaintiff also leases filling, capping, and container-forming machines to dairies and other customers for use in connection with plaintiff’s products.
2. For all years involved in this proceeding, the plaintiff kept its books and filed its Federal income tax returns on a calendar year basis under the accrual method of accounting.
3. The plaintiff owns in fee simple a completely integrated plant on the Oswego Eiver at Fulton, New York. As of December 31, 1949, the plant consisted of a pulp mill and pulpwood storage yard, a paper mill and boiler plant, a bottle cap factory, a container factory, a machine shop, warehouses, a general office building, and a hydroelectric power plant. In 1949 plaintiff began construction of a Sealkmg factory building to house its new milk carton manufactur *445 ing equipment and plastic coating equipment plant. In the same year construction work was also begun on a solvent recovery plant (to be used in conjunction with the plastic coating equipment in the Sealking building) and a new building to house the plaintiff’s expanded machine shop. While these new buildings were near completion at the end of 1949, they were all completed during 1950. The total cost of the new Sealking building, including site preparation, thé related solvent recovery plant, and boiler facilities, was $1,059,414, of which $544,591 was expended in 1949 for work completed in that year. As of December 31,1946, and as of December 31,1949, the plaintiff owned in fee a branch plant in Kansas City, Kansas, which consisted of a bottle cap factory and a container factory.
4. Plaintiff, manufactures part of the paper and paperboard which it uses and purchases the rest in the open market. The material for the manufacture of paperboard is groundwood and chemical pulp. The plaintiff produces all the groundwood pulp it requires in its own pulp mill and purchases all of the chemical pulp it requires in the open market.
5. The following groups of finished products were manufactured for sale by the plaintiff both on December 31,1946 and on December 31,1949:
(a) Plug Oaf — a flat disc of paperboard which is used principally as a milk bottle closure.
(b) Ooverite — a semi-hood closure (i. e., covers the-pouring lip) for both conical paper and ordinary glass milk bottles.
(c) Sedlon — a full-hood (i. e., covers the pouring lip and neck of the bottle), plastic coated, self-sealing milk bottle closure which does not need wire or tape to hold it to the bottle.
(d) Kone Bottle — a conical heavy-waxed sanitary paper milk bottle for use, with either the Plug Cap or Coverite closure, in the retail distribution of milk, buttermilk, cream, orange juice and other liquids.
- (e) DisJeuf — a sanitary nesting-type, double-wrapped paper cup with a disc-inserted lid for use principally in the retail distribution of ice cream, cottage cheese; and other dairy products. The lids for the Diskup aré manufactured in the Bottle Cap Department..
*446 (f) Cylindrical Can — a liquid-tight, cylindrical, sanitary paperboard container with a slip-on type of cover for ice cream and moist foods.
(g) Nestyle — a liquid-tight, tapered or nesting-type sanitary paperboard container with a slip-on type of cover for ice cream and moist foods.
' (h) Bulkan — a large cylindrical sanitary paperboard container made in capacities ranging from one gallon to forty pounds for use in packaging ice cream, frozen cream, fruits, eggs and similar products.
(i) Cup — a sanitary, nesting-type, single-wrap paper cup with a snap-in disc lid use principally for packaging ice eream.
6. All of the above products were manufactured at the plaintiff’s plant in Fulton, as of the end of 1946 and 1949. None Bottle, Cylindrical Can, Nestyle, Bulkan, Plug Cap, and Sealon were also manufactured at the plant in Nansas City during the same periods.
All of the plaintiff’s products "are manufactured almost 100 percent from a class of paperboard designated as special food board.
7. In 1948 plaintiff began production at its Fulton plant of square plastic-coated sanitary paper milk cartons called Sealkings.
8. In addition, the plaintiff at the end of 1949 leased to its customers specialized machines for forming and/or filling Sealking cartons, dispensing and closing its nesting-type containers with cover-all lids, applying Sealon hoods to glass milk bottles, and forming the Bulkan containers. Only the specialized inachines for applying Sealon hoods and forming Bulkan containers were on hand for lease to customers as of December 31, 1946. As of December 31,1946 and December 31,1949, the plaintiff held for lease the following specialized machines:
Type of Machine No. of Machines on Hand 12/31/46 No. of Machines on Hand 12/31/49
Sealking Dairy Machines.. None 3
Nestyle Dispensing Machines.. None 1
Nestyle Covering Machines.... None 1
Sealon Applying Machines. 907 1,483
Bulkan Assembling Machines.. 784 1,401
*447 . 9. Income derived from the rental of the above specialized equipment amounted to' $125,510 iñ 1946, and to $826,430157 i-n 1949. ' "'.-t ■
10. The Plug Cap is made in one continuous operation on a plug cap machine. As ahull of paperboard is fed into the machine,-it is first .printed’with the-customer’s design.. As the paperboard moves along, a small half-moon 'section is picked out of the top ply of the paperboard to provide a lifting tab, and a wife stitch is placed in the cap to reinforce the tab.- The caps are then punched out in a multiple^ die operation, wax treated, air dried,’and accumulated in tubes for shipment. As of December 31,1946, plaintiff had 23 plug cap machines, and as of December 31,1949, plaintiff had 22‘plug cap machines^ : '
11. The Coverite is a two-piece cap. The outer shell of this cap is made on a Coverite disc press -by blanking out round discs of paperboard and running these discs through a long wax bath and air-drying process to thoroughly impregnate the paperboard with wax.’' The inner plug of the Coverite is made by punching out- small discs on an "inner disc machine. The inner plug is then passed through a light wax bath. The outer shells and inner plugs are formed into the finished Coverite cap in a punch and die operation in the forming machines. As of December 31, 1946, the - plaintiff had 4 outer shell machines, 2 inner disc-machines and 18 forming machines. As of December '31, '1949,' the plaintiff had 5 outer shell machines, 2 inner .;dis'c machines arid 21 forming machines. ' ■ '
■ 12. The Sealon cap is a' round disc of paperboard, coated ori both sides with therriióplastic, and with pleats, around the outer circumference.' Sealon is manufactured iri two operations. First, a large roll of plain or colored paperboard is fed into the Sealon printer. 'As.the paperboard progresses through the machine it is printed, embossed, scored, puriched, and pushed into stacks. ■ The caps are -then taken to the Sealoif coatérs where" they recéivé á coating of thermoplastic". They are then carried through a drying oveii to the packing end of the inachine. As of December "31, 1946, the plaintiff had 20 Sealon printers and 21 Sealon coaters. As of December 31, 1949, the plaintiff had 25 *448 Sealon printers and 25 Sealon coaters. At the end of 1946, all coaters were operating at 115 rpm, but engineering changes made to a number of the coaters during 1947 and 1948 resulted in 17 of the 25 coaters on hand as of December 31,1949 having machine speeds of 139 rpm.
13. The Kone Bottle is a cylindrical, tapered container consisting of a sidewall, a tin top ring and a bottom or end. If the Kone Bottle is to be printed with the name and design of a particular customer, the sidewall blanks are manufactured by feeding a roll of plain paperboard to a blanking press and the resulting blanks are then printed on an International press, a blank-fed printer. In the case of stock design sidewalls, the paperboard is first printed with an overall design on a large rotary printer, the Crawford press, and the roll of paperboard then goes to the blanking press. The sidewall blanks are then taken to the Kone Bottle winders. On this machine the blanks are wrapped around a tapered mandrel and glued together and the tin top rings are inserted in the smaller end or top of the cone. The tin top rings are formed by feeding a flat sheet of metal into a press that blanks and draws the ring in one operation. From here the rings go to high speed punch presses that punch out the center section of the ring. From the winders the partially processed Kone Bottle goes to the end machines where a round disc of paperboard is blanked from a roll and glued and crimped into the bottom of the cone. The Kone Bottles then pass through the waxer where they are completely immersed in hot wax. As of December 31,1946, the plaintiff had 2 blanking presses, 6 winders, 6 end machines, 6 waxers, 2 Callahan presses, 4 Adriance presses, 2 tin slit-ters, 4 International presses and 1 Crawford press. As of December 31, 1949, the same machines were on hand, plus 2 additional blanking presses and 3 additional International presses. The blanking presses and the International presses were used not only to produce Kone Bottle blanks but also Nestyle and Diskup blanks. The blanking presses and the International presses, as shown, are restated in findings 14 and 16, infra, for purposes of the manufacturing process only.
*449 14. The Diskup, a tapered container, is formed.from a long blank that is wrapped twice around a mandrel. The blanks are punched out by a blanking press from a roll of paperboard which has been slit to the proper width. The blanks are printed on an International Press, a blank-fed printer. They then go to the Diskup winding and finishing machine where the blanks are wrapped twice around a tapered mandrel, glued, and a bottom is inserted and glued. The same machine also adds a top roll and lid seat to the Diskup. The bottoms for Diskup are punched out by a Diskup bottom machine and the snap-in lids are manufactured on a Diskup lid machine. As of December 31, 1946 and December 31, 1949, the plaintiff had 3 Diskup winding and finishing machines, 1 bottom machine, and 1 lid machine. In addition, as noted in finding 13, supra, the plaintiff had 2 blanking presses and 4 International presses as of December 31, 1946 and 4 blanking presses and 7 International presses as of December 31,1949. The blanking presses and the International presses were used not only to produce Diskup blanks but also Kone Bottle and Nestyle blanks.
15. The Cylindrical Can is a straight sided paperboard container consisting of a sidewall, a bottom and slip-on type cover. The sidewall is manufactured on a spiral tube winder. The round tube produced by the winder then goes to the cutter where the tube is cut into proper lengths for the sidewalls. The sidewalls and the bottoms (discs of paperboard punched out of a roll) are assembled on a body assembly machine. The coyer is manufactured in the same maimer and on the same type of equipment as the sidewall and bottom, except that the cover is printed on a Young press or the Manhasset press. As of December 31,1946, the plaintiff had 15 Cylindrical Can tube winders, 15 tube cutters, 13 body assembly machines, 13 cover assembly machines and 5 Young presses. As of December 31,1949, the plaintiff had 15 Cylindrical Can tube winders, 15 tube cutters, 19 body assembly machines, 19 cover assembly machines and 5 Young presses. The Young presses were used to print not only Cylindrical Can covers but also Nestyle covers and Cup sidewall blanks.
*450 ' 16. The Nestyle is a tapered container, consisting of a sidewall, bottom and cover. For all orders in 1946 and for relatively small orders in 1949,"the sidewall blanks were stamped out of a roll of paperboard by a blanking press and they then went to an International press, a' blank-fed printer,' for individual customer design. In 1949 large orders were first printed on the Manhasset press and the sidewáll blanks were then stamped out of the printed roll by a blanking press. The bottoms are stamped out on a bottom disc machine. The printed blanks are wound into a tapered cone on the Nestyle winders, and the bottom is inserted on the same machine. ' From the winder the Nestlye goes to the topper machine where the top edge- of the container is formed into: a roll to act-as a seat for the cover. The manufacture of the Nestyle cover requires use of four machines: the cover winder, the cover cutter, the cover' assembly mafchine, and' either a Young press or the Manhasset press. As of December 31, 1946, the plaintiff had 13 Nestyle sidewall winders, 4 Nestyle bottom disc machines, 21 Nestyle toppers, 6 Ne-style cover winders, 8 Nestyle cover cutters, 12 cover assem-' bly machines, 2 blanking presses, 4 International presses and 5 Young presses. As of December 31,1949, the plaintiff had 16 Nestyle sidewall winders, 4 Nestyle bottom disc machines, 24 Nestyle toppers, 6 Nestyle cover winders, 10 cover cutters, 17 cover assembly machines, 4 blanking presses, 7 International -presses, ‘5 Young presses and 1 Manhasset press.'
' 17. The Bulkan is a cylindrical paperboard container that' is reinforced with a metal ring at the top and bottom. " It' consists of 4 component parts: sidewall, cover, bottomland metal rings. The sidewall is manufactured on a spiral tube winder. From the winder the tube goes ’ to a tube cutter where the long tube is cut into the proper lengths for the finished sidewall. The round sidewalls are then'conveyed to the scoring machines where the sidewall is indented or scored-a number' of times around the circumference. In the ’scoring operation the customer’s name is generally placed 'oh ,the; Bulkan in the form of a die-stamped impression in the board. Most Bulkan sidewalls carry no identification othér than the die-stamped impression. If, however, the customer wants the sidewall printed, it is passed through the Hooper *451 press and printed in flattened form. The cover is formed on a machine that blanks out a round disc of paperboard from a roll, draws the disc and inserts it in a paperboard ring and glues the two together. The tin rings are formed from strips of tin-plated steel which is fed from a roll into the ring-forming machine. The Bulkan bottoms are formed by blanking round discs of paperboard from a roll. The bottom is preformed by drawing through a die and a tin ring is placed around the bottom disc. The Bulkan bottom machine then performs a punching operation wherein a small section of the. metal ring is driven through the paperboard disc at several points around the circumference in order to hold the metal ring and paper disc loosely.together. The component parts of the Bulkan are shipped to the customer for assembly by the customer. As of December 31, 1946, the plaintiff had 4 Bulkan tube winders, 5 tube cutters, 1 automatic scoring machine, 4 hand scoring machines, 3 cover machines, 3 bottom machines and 5 ring machines. As of December 31,1949, the plaintiff had 1 Bulkan tin slitter, 8 Bulkan tube winders, 10 Bulkan tube cutters, 4 automatic scoring machines, 5 cover machines, 5 bottom machines and 8 l'ing machines.
18. The Cup, a single-wrap tapered container, is manufactured in four steps. The paperboard for this product is first slit into the proper roll width and then printed in roll form on either a Young press or the Manhasset press. It is then delivered to the B machines where printed blanks are punched out of the roll, glued and wrapped around a mandrel. The round cones, without a bottom, are then transported to the C machines. The C machine punches bottom discs from a roll of paperboard and inserts them into the bottom of the round cones produced on the B machines. The Cups so formed go to the waxers. At the waxers the completed Cups are fed into a machine where they are immersed in hot wax and then ejected to a canvas conveyor belt that carries them through an air-drying process to the packing table. The lids for the Cups are manufactured on a lid machine. As of December 31, 1946 and December 31, 1949, the plaintiff had 6 B machines, 6 C machines, 6 waxers, 1 lid machine and 5 Young presses. In addition, plaintiff had 1 Manhasset press as of December 31, 1949.
*452 The production of the various products is dependent upon the orders'and to produce, them in the quantities ordered, plaintiff finds it necessary to disassemble certain machines to produce other articles. Plaintiff, therefore, endeavors to complete as many orders for the same size and shape before changing to other sizes and shapes as possible. The use of different inks also requires similar utilization of the set-up machine to avoid too frequent washing of the fountains.
19. About 1940, plaintiff developed a special paper carton, rectangular in shape, which would hold one quart of liquid. This product was given the name Sealking upon which a patent was obtained. Development of this product was suspended during the period of World War II but was reactivated just before the war ended. It took about four years for plaintiff’s engineering department to design and produce the equipment to fully utilize the product. The carton in a knocked-down condition is shipped to the using dairy where it is assembled, filled, and sealed in one operation on machines developed by plaintiff and leased to the dairy plant. Sealking was created to place plaintiff in a better competitive position with the American Can Company, and the manufacturers of Pure-Pak for the milk packaging business of large dairies such as Borden, Sealtest, and Sheffield Farms. It was necessary to put in high-speed equipment to produce these units at the very lowest costs possible in order to sell at a price to meet the competition.
At the time of the development of Sealking, plaintiff was manufacturing and supplying a quart-sized, truncated, cone-shaped container for liquids which it called the Kone Bottle. It was sealed with a plug cap or a coverite closure. Kone Bottle was the only product manufactured by plaintiff that was comparable in terms of specific end use to the Sealking, although all of plaintiff’s products are used primarily for the packaging of moist and liquid foods. All are made from the same raw material,, and all have similarities in their manufacturing processes. It varied in shape from the Kone Bottle, however, and its manufacture required different machines. Furthermore, its efficient utilization in the industry required machines for forming and sealing at the plant of the user.
*453 The new equipment required to manufacture the Sealking container was a very large coating machine for applying the plastic resin to the paper; a lacquer mixing plant for mixing the lacquers; high-speed printing pi’ess for printing, scoring, and blanking out the sidewalls; a similar press for printing and blanking out the tops; and a similar press for blanking the bottoms. Other equipment such as paper slitting machines were also necessary. Manufacture of Seal-king was first set up in cramped quarters in an old building across the river from plaintiff’s main plant. When it became apparent the new Sealking was going to become commercially acceptable, a new building was constructed to house the required new equipment. Also a solvent recovery plant was constructed because of the volume of solvent that would be used. The policy of plaintiff is to keep details of process equipment secret and for that reason patents are not obtained on production equipment. Patents were obtained on the machines leased to customers for assembling, filling, and sealing of the Sealking container. The dollar volume of sales of Sealking increased from $61,000 in 1948 to $5,000,000 in 1953.
20. The component parts of the Sealking paper milk carton, all of which are manufactured from rolls of paperboard which are given a coat of plastic and slit to proper width, are sidewall, top, and bottom. The sidewall is produced by passing a roll of paperboard through a machine that prints, scores, slits and blanks out completed flat sidewall blanks. Tops and bottoms are manufactured in much the same; way. The component parts are shipped to the customer for assembly by the customer. On December 31, 1949, the plaintiff had one Crawford sidewall machine, one Crawford top blanker, one Crawford bottom machine, one Waldron coater, one Cameron slitter, one Champlain top blanker and one Champlain bottom machine. In addition, by December 31, 1950, plaintiff had installed the following machinery in its newly constructed Sealking building: one Egan coater, two Champlain sidewall machines. The plaintiff had no Sealking equipment as of December 31, 1946.
21. The maximum capacity (i. e., the rated engineering capacity) in units of production per machine hour of the *454 various types of basic equipment used by plaintiff in the manufacture of each of its finished products, as of December 31, 1946, and December 31, 1949, based upon the most popular product size in each product group in 1949, is as follows:
Product Description of Machine Maximum Capacity in Units Per Machine Hour as of 12/31/46 Maximum Capacity in Units Per Machine Hour as of 12/31/49 •
Plug Cap — . Plug Cap Machine. 101,880 101,880
Coverite. Outer Shell--.-. 24,480 24,480
Inner Disc__ 90,628 90,528
Forming Machine. 5,320 5,320
Sealon. Printer.-. 42,120 42,120
Coater, 116 rpm. 27,600 27,600
Coater, 139 rpm. 33,360
ICone Bottle. Winder.— 4,200 4,200
Blanking Press. 36,040 35,040
End Machine... 4,410 4,410
Waxer. — .. 4,860 4,860
Callahan Press... 17,340 17,340
Adriance Press.. 10,740 10,740
International Press. 24,286 24,286
Diskup. Winder_ 2,688 2,688
Bottom Machine... 22,230 22,230
Lid Machine_ 22,230 22,230
Blanking Press.... 26,280 26,280
International Press.. 12,651 12, 651
Cylindrical Can. Tube Winder. 13,464 13,464
Body Assembly_ 4,434 4,434
Cover Assembly... 4,434 4,434
Tube Cutter.. 13,464 13,464
Young Press..*. 19,200 19,200
Manhasset Press_ 67,081
Nestyle. Blanking Press. 52,560 62,560
Sidewall Winders. 3,915 3,915
Toppers... 4,428 4,428
Bottom Disc Machine_ 28,170 28,170
Cover Winders. 45,180 45,180
Cover Cutters__ 45,180 45,180
Cover Assembly_ 3,888 3,888
International Press.. 24,286 24,286
Manhasset Press (sidewalls)-. 60,218
Manhasset Press (covers)-.--83,633
Young Press. 19,200 19,200
Bulkan. Tin Slitter__ [1]2,125
Tube Winder___ 3,318 3,318
Tube Cutter__ 3,318 3,318
Automatic Scorer.. 6,660 6,660
Hand Scorer_ 2,250
Cover Machine__ 3,000 3,000
Bottom Machine. 2,961 2,961
Ring Machine-. 4,500 4,500
Cup. “B" Machine. 4,494 4,494
“C” Machine__ 4,290 4,290
Lid Machine. 46,240 45,240
Waxer. 4,200 4,200
Young Press.-. 9,600 9,600
Manhasset Press. 114,242
Sealking. Crawford Side--. 37,020
Crawford Top.-. 59,760
Crawford Bottom.. 68,297
Waldron Coater.— [2]15,000
Cameron Slitter.— [2] 59,700
Champlain Top.-. 41,400
Champlain Bottom_ 63,360
Champlain Side_ 44,941
Egan Coater. — . [2] 21,000
*455 22. The following tabulation sets forth the pounds of paperboard and the square feet of paperboard required to produce 1,000 units of each of the plaintiff’s finished products, based upon the most popular product size in each product line in 1949:
Pounds of Paperboard Required Per 1,000 Units Square Feet of Paperboard Required Per 1,000 Units Product
2.71 17.60 Plug Cap.
9. 14 86.08 Coverite..
3.28 . 75.69 Sealon__
90.80 1,021.86 Rone Bottle_
45.73 815.63 Diskup-.
84.17 1,100.25 Cylindrical Can..
74.64 894.04 Nestyle..
479.54 6,340.39 Bulkan. — _
16.55 327.62 Cup.
84.02 917.43 Sealking. ..
23. The following tabulation sets forth the average cost per pound of paperboard used- to produce each of plaintiff’s finished products and the average cost of paperboard required to produce 1000 units of each of said finished products, based upon costs of paperboard included in plaintiff’s paperboard inventory as of December 31,1949:
Product Cost of Paperboard*
Per Pound Per 1000 Units •
$0.06949 $0.18832 Plug Cap.
. 07910 . 72296 Coverite_
.081469 . 26722 Sealon..
.07512 6.8209 Kone Bottle. — .
. 08079 3/6944 Diskup. — .
. 076652 6.4518 Cylindrical Can..
. 08678 6.4775 Nestyle.-..
. 057903 27.7669 Bulkan...
. 076622 1.26809 Cup..
. 08652 7.2695 Sealking.
*456 24. The factor limiting plaintiff’s capacity to produce each of its finished products as of December 31, 1946 and December 31,1949, was as follows:
Product Limiting Factor
December 31,1946 December 31,1949
Plug Cap. Plug Cap Machine_ Plug Cap Machine.
Coverite_ Forming Machine_ Forming Machine.
Sealon.. Coater_ Coater.
Kone Bottle_ Winder--__ Winder.
Diskup__ Winder_ Winder.
Cylindrical Can.. Body and Cover Assembly Machines. Body and Cover Assembly Machines.
Nestyle-_ Young Press_ Winder.
Bulkan__ Bottom Machine_ Bottom Machine.
Cup.. Young Press_ Waxer.
Sealking**. (Not Produced)_ Top Machine.
25. The plaintiff’s capacity for production per hour for each of its finished products, measured in terms of 1000 units, as of December 31,1946 and December 31,1949, was as follows:
Product Capacity per Hour-Units (000 omitted)
December 31,1946 December 31,1949
2,343.24 2,241.36 Plug Cap_
95.76 111.72 Coverite_
579.6 787.92 SeaIon__..
25.2 25.2 Kone Bottle_
8.064 8.064 Diskup. ..
57,642 84.246 Cylindrical Can_.
38.362 62.64 Nestyle.
8.883 14.805 Bulkan_
0 25.2 Cup.
0 101.160 Sealking*_
*457 28. The plaintiff’s capacity for production per hour for each of its finished products, measured in terms of pounds of paperboard required to produce capacity quantities set forth in finding 25, supra, as of December 31, 1946 and December 31,1949, is as follows:
Product Capacity Per Hour (Pounds of Paperboard)
December 31,1946 December 31,1949
6,360 6,074 Plug Cap.
876 1,021 Coverite._..
1,901 2,584 Sealon_
2,288 2,288 Kone Bottle.
369 369 Diskup_
4,852 7,091 Cylindrical Can..
2,863 4,675 Nestyle.
4,259 7,100 Bulkan.
0 417 Cup.
0 8,499 Sealking**_
27. The plaintiff’s capacity for production per hour, measured in terms of square feet of paperboard required to produce the capacity quantities set forth in finding 25, supra, as of December 31,1946 and December 31,1949, is as follows:
Product Capacity in Terms of Sq. Ft. of Board
December 31, 1946 December 31, 1949
41,241 39,448 Plug Cap.
8,243' 9,617 Coverite.
43,870 59,638 Sealon.-.
25,751 25,751 Kone Bottle.
6,577 6,577 Diskup__
63,422 92,694 Cylindrical Can..
34,297 66,003 Nestyle_
56,322 93,869 Bulkan__
0 8,256 Cup...
0 92,812 Sealking*.
28. The plaintiff’s capacity for production per hour for each of its finished products measured in terms of cost of paperboard required to produce the capacity quantities set *458 forth, in finding 25, supra,, as of December 81,1946 and December 31,1949, is as follows:
Product • Capacity in Terms of Board Cost*
December 31, 1946 December 31, 1949
$441.27 $422.09 Plug Cap..
69.23 80.77 Coverite.
154.88 210.65 Sealon__
171.89 171.89 Kbne Bottle_
29.79 29.79 Diskup_
371.89 543.54 Cylindrical Can..
248.49 405.75 Nestyle.
246.65 411.09 Bulkan_
0 31.96 Cup__
0 735.38 Sealking_
29. As of December 31, 1946, the adjusted basis for determining gain upon sale or exchange of plaintiff’s total facilities, as defined in section 444 (d) of the Internal Revenue Code of 1939, was $4,694,647.91.
As of December 31, 1949, the adjusted basis for determining gain upon sale or exchange of plaintiff’s total facilities was $8,104,074.34. Under the commitment rule of section 444 (f) of the Internal Revenue Code of 1939, said adjusted basis as of December 31, 1949, is $9,720,985.20.
Plaintiff’s total assets on December 31, 1949, as defined in section 442 (f) of the Internal Revenue Code of 1939, was $15,753,816.27.
30. Plaintiff’s industry classification for purposes of section 444 of the Internal Revenue Code of 1939 is paper and allied products, which had a base period rate of return of. 17.8 percent.
The segment of the paper and allied products industry to which plaintiff belongs is the paperboard converting industry, and more particularly, that part of the paperboard converting industry which manufacturers paperboard containers and closures from a class or grade of paperboard known as special food' board. It- is customary in plaintiff’s industry, whether viewed in its broadest scope as the paper and allied products industry, or more narrowly, as the paperboard con *459 verting industry, or tbe paperboard food container and closure industry, to measure overall capacity for production, where capacities to produce a variety of end products are being combined, in terms of the quantity of paperboard consumed in the production operations. The capacity for production of each of the products is shown in findings 25 and 26.
31. Measured in terms of the pounds of paperboard required to produce plaintiff’s products at capacity levels of operation, plaintiff increased its capacity for production by 68.87 percent between December 31, 1946, and December 31, 1949. Measured in terms of square feet of paperboard required to produce plaintiff’s products at capacity levels of operation, plaintiff increased its capacity for production by 73.27 percent between December 31, 1946, and December 31, 1949. Measured in terms of the cost of paperboard required to produce plaintiff’s products at capacity levels of operation, plaintiff increased its capacity for production by 75.47 percent between December 31, 1946, and December 31,1949.
Measured in terms of completed units of the various containers and closures produced by plaintiff from liquid-proof food board, plaintiff increased its capacity of production for all items by 9.86 percent between December 31, 1946, and December 31,1949.
■ 32. Plaintiff filed.timely income tax returns for the taxable years 1950, 1951, 1952, and-1953, respectively, on the basis that it was entitled to compute its excess profits credit for excess profits tax purposes under the provisions of section 444 of the Internal Revenue Code of 1939.
On February 1, 1956, as a result of deficiencies determined by the Internal Revenue Service, plaintiff paid excess profits tax and assessed interest for each of the years 1950,1952, and 1953, as follows:
Excess Profits Tax Assessed .Interest Year
$164,365.05 $44,547.19 1950».
86,301.99 14,912.51 1952..
223,401.10 25,198.42 1953..
*460 33. On April 16, 1956, the plaintiff filed with the District Director of Internal Revenue, at Syracuse, New York, claims for refund (Form 843) in the amounts of $164,365.05, $86,301.99, and $223,401.10, plus assessed and statutory interest, for the years 1950, 1952, and 1953, respectively. The basis of the said claims was that plaintiff was entitled to compute its excess profits tax credit under the provisions of section 444 of the Internal Eevenue Code of 1939.
On August 20, 1956, plaintiff’s claim for refund for the years 1950, 1952, and 1953, were disallowed by the District Director of Internal Eevenue at Syracuse, New York.
34. It has been stipulated that if the court finds plaintiff is entitled to compute its average base period net income for excess profits credit purposes under the provisions of section 444 of the Internal Eevenue Code of 1939, judgment should be entered for the plaintiff in the amount of $526,047.45, with interest thereon, as provided by law.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States five hundred twenty-six thousand forty-seven dollars and forty-five cents ($526,047.45), together with interest thereon, as provided by law.

 Section 444 Internal Revenue Code of 1939 (53. Stat. 1), as amended by tbe Excess Profits Tax Act of 1950, chap. 1199, 64 Stat. 1137.

 Pounds.

 Linear feet.

Cost figures were derived from cost data contained in plaintiff's books and records with respect to its inventory of paperboard at December 31, 1949.

Under the commitment rule of section 444 (f), the Sealking equipment on hand on December 31,1950 is deemed to have been available on December 31, 1949.

 Determined under the commitment rule of section 444 (f).

Determined under the commitment rule of section 444 (f).

 Determined under the commitment rule of section 444 (f).

Cost has been computed for both dates in terms of 1949 dollars only. That is, cost for both dates is based on plaintiff's inventory valuation of paperboard as of December 31, 1949.